United States v. Dixon, Mr. Gonzales, we're going to hear from you first and speak with us, please. Good morning, may it please the court. Manuel Gonzales on behalf of Maureen Chacon. Your honors, this case, a conspiracy charge begins from 2011 through 2014. I'm going to focus right now with counts eight and nine, which deal with, they're tied into counts six and seven, which were the Vicar counts, an armed robbery that supposedly took place the 20th and 21st of November 2013. The main argument here is that Mr. Chacon was charged in count six and seven, but the court dismissed that at rule 29. And the reasoning was that there was not reasonably foreseeable for Mr. Chacon to know that these individuals would commit an armed robbery and that he did not order it or anything of that nature. What then transpires is that those individuals commit the robbery and they flee. And when they flee, they go back to an abandoned building. An abandoned building that the testimony of the Nadine Cerquera was, which was one of the cooperating co-defendants, was that he and Chacon were sleeping there. That was a place where homeless people stayed there. And the reason that I mentioned that about count six and seven is that the government argues that the reason that the court should affirm these convictions is based on if Chacon did not know that these individuals were going to go commit a robbery, how would it be, and it wasn't reasonably foreseeable for him, how could it be reasonably foreseeable for him that they would flee and actually go back and wake them up? That was a testimony of Nadine Guzman. And also, Officer Collada testified, Your Honors, that when he arrived there, because they tracked the vehicle back to that place because of the iPhone, the what he actually saw was Thompson, which was one of the two individuals involved in the armed robbery, and the victims came in and said, with a gun, and that Thompson, he saw actually pull out from his pocket and throw on a bed the narcotics that were seized. Now, in addition, there was a firearm then found on the ceiling somewhere. There was no clear indication where exactly it was. So what I am arguing is that counts eight and nine, it was not even under Pinkerton, it was not reasonably foreseeable for Mr. Chacon to have that knowledge that these individuals were coming back. Now, that all ties in, Your Honors, with the fact that the court allowed numerous uncharged robberies, even though the conspiracy was to possess with intent to drugs, primarily crack cocaine, it became a case of uncharged, unsubstantiated, where individuals came in and talked about, you know, robberies that may have taken place in the past. Counsel, I thought there was evidence that the robberies were committed to obtain money, to buy drugs, and that that was part of the conspiracy. That basically, Nadine Guzman testified as to his involvement. There was nothing that tied in Mr. Chacon with buying any drugs as a result of the proceeds from any robberies. As a matter of fact, Mr. Guzman testified that he sold to Mr. Chacon small amounts of marijuana and actually provided the narcotics. I am basically just about out of time. I would argue that the cumulative errors committed caused a substantial prejudice and harm to Mr. Chacon, and therefore, I would ask the court to reverse and grant a new trial or reverse for new sentencing. Thank you, Your Honors. Okay, Mr. Horwitz. May it please the court. Counsel, good morning. My name is Phil Horwitz, and I represent Christopher Altamirano, who was convicted in this case. Like many of the other appellants here, he was convicted in count one, which is the overall drug conspiracy, and Mr. Altamirano was convicted also of a few substantive drug offenses. In addition, Mr. Altamirano was convicted of count six and count seven, which is where I want to try to confine my arguments this morning. In count six, Mr. Altamirano was convicted of VICAR, or violent crime in aid of racketeering. And in count seven, it was a 924 seat count, which was alleged that he possessed a firearm and used and carried a firearm in furtherance of a crime of violence. That is count six. So those two counts are very interrelated. Excuse the question, because I didn't quite understand your brief. Yes, Your Honor. There were actually, the robbery witnesses testified at trial? Yes, Your Honor. There were four victims. Each one of the four victims testified at trial, and their testimony is summarized in my brief at pages six through eight. And that wasn't sufficient? No. The four victims that testified were unable to identify Mr. Altamirano and also Mr. Thompson, who was not at trial, but specifically Mr. Altamirano as the perpetrator of the way he was charged as an assault with a deadly weapon. We've colloquially referred to it as a robbery, because items were taken supposedly with a firearm. But the way he was charged was an assault with a deadly weapon. So those four victims were able, and they testified, were able to identify Mr. Altamirano at the scene. In addition, a couple of the victims were asked during the trial to step down, walk into the well, right in front of all five defendants that had proceeded to trial, and specifically it was Norlin Obregon, and it's docket entry number 831 at page 32, where he literally stepped down and was unable, in court, to make an identification. So we have four victims, no identifications at the scene, and I think it was two that were asked in court to step down and literally walked in front of the five, since I was one of the trial attorneys, walked in front of the five defendants and weren't able to make an identification as to who they felt was the Hispanic male that was part of the robbery and discharged the firearm. There was a size difference between the two suspects, and they were able to identify the Hispanic person, the thin one, as the one who, as they were leaving fire duty. 924C, uptick for discharge? Yes, it was, Your Honor. However, what happened during the trial was the jury had asked for a new verdict form. Apparently, they were out for a few days and had written all over it, and somehow the judge's chambers, when they gave them a new verdict form, gave them an older version, and it did not have the interrogatory on it. So Mr. Altamirano was convicted of using carrying and not the discharge. I see that my time is up. I know the three minutes... You've saved a minute for rebuttal. Yes. Thank you very much, Your Honor. Thank you, Mr. Horwitz. Mr. Samms? Good morning. I am Gregory Samms. I represent the appellant Rodolfo Portello. I will first argue that the court erred when it denied the appellant's motion to suppress a firearm, ammunition, and post-arrest statements at the time of the stop. At the time that my client was stopped, he was a passenger in a vehicle, and the vehicle was being driven by his girlfriend. They were pulled over from driving on the wrong side of the road. Trial counsel did not challenge the stop. However, once the car was stopped, testimony indicated that my client was in the passenger seat. The window was up, and when the officer came to him and asked him what he's doing to the car, he got out of the car, and then the officer had him move away to other officers. Problem is, he's not the driver. I'm not sure that he has standing to complain about it. Well, that is a big issue in this case, and I believe the court found that he didn't have standing, but I believe there was sufficient indicia of him having the right to use the car. What's your best case for the passenger, the person in the passenger seat? Well, I think standing to complain about the search of the car. It's not his car. He's not driving it. He's not in control of it. What's your best case for the notion that he would have standing to complain about the search? Well, there isn't a case directly on point when the passenger is also with the owner of the car at the same time, who the owner has given him permission to. The owner can certainly complain, but I don't see how your client can. Okay. I think I'm going to move on to another issue while I have some time, which is the big elephant in the room, and that is whether or not my client has a right to actually file this appeal. At the time that he entered into his plea, there was a letter agreement that was negotiated by his second lawyer, not his trial lawyer, and in that letter agreement was a appellate waiver. However, during the sentencing hearing, it came out through his defense counsel that Mr. Portel has significant mental cognitive deficits, and I'm arguing at this particular time that when the court was given those words, in other words, the court was told that he had a history of head injuries, which impaired his ability to learn. His higher executive function was impaired. His impulse control was impaired due to deficits in the frontal lobe. That was what was told to the court at that time. In the possession of the defense counsel was the complete report, which also indicated additional mental concerns. The problem is this psychological report's not in the record, right? It's not in the record in that sense, but at the time . . . And the government introduced evidence that he was malingering? There was evidence that he was malingering that was introduced by the government. And so we have to say that the district court abused its discretion when it failed to hold a competency hearing sua sponte? Yes, that is what I'm saying at that point, because at the time when the court was notified of the nature of the mental cognitive deficits, which were significant, and the requirement that the court also has to do a separate colloquy as to whether or not he understood his appellate waiver, because there was a lot of issues going on at the time that he was entering his plea. There was a letter agreement, and then there was a separate part about the appellate waiver. The court never went into depth in any manner about whether or not he understood he was getting up his right to appeal. As a matter of fact, the court only made one question, one sentence in regards to whether or not he knew that he was waiving his right to appeal when she said specifically, do you know there's an appellate waiver in here? And he said, yes. Your time's expired. Thank you, Judge. You're going to save a minute for rebuttal. Mr. Wu? Oh, I'm sorry. I apologize. Mr. Donahue, I'm sorry. Good morning, Your Honors. My name is David Donahue, Jr., and I represent James Dixon and this appeal. It is Mr. Dixon's argument in position that the evidence in this case was insufficient to establish that Mr. Dixon was a part of this conspiracy, or even that there was a conspiracy. What the evidence was able to establish is Mr. Dixon was a 21-year-old homeless kid who sold drugs in this neighborhood, knew some of the individuals in this so-called BMT organization. But the evidence that came out is not one where he's sharing commissions or profits, where he's pooling his money with others, where he's brokering deals for other people who are selling there. It's somebody who the evidence was very clear. He did not participate in any robberies. All he did was sell very small amounts of crack cocaine. Well, we've got a couple of witnesses who say he was working with the others, right? Don't we have Veloz testifying? They conducted a control purchase. Dixon, with another co-conspirator and Zerchera, identified Dixon as a member of the team and testified he saw Dixon selling drugs more than a dozen times. Yes, sir. Now, as to Detective Veloz, Detective Veloz purchased, he was the undercover who would go in to purchase drugs in this neighborhood. He made one purchase from Mr. Dixon. With another co-conspirator. Well, Mr. Dixon was by himself. Another co-conspirator then comes over and joins the conversation, Miguel Rodriguez. But the sale is solely with Mr. Dixon. It's for two-tenths of an ounce of crack cocaine. It was six tiny crack rocks. That's the one and only time. And at that time, Mr. Dixon is standing in the street by himself. There's no one around him. Detective Veloz goes straight to him. There's nobody acting as a lookout. There's nobody holding anything. It's Mr. Dixon by himself. What about Zerchera? There is also testimony from Diane Zerchera and Nadine Guzman. Diane Zerchera, who talks about him witnessing Mr. Dixon sell. Mr. Zerchera's testimony was wrought with inconsistencies and a lot of speculation. And a lot of that as well goes to his testimony regarding the weight as to how much crack was actually being sold. And that it was not foreseeable that Mr. Dixon be charged with the part of the conspiracy. If your honors find that he was part of the conspiracy, that his conduct was not foreseeable, that it's not foreseeable that the organization or this BMT during this conspiracy sold over 280 grams of cocaine. Because that evidence was purely speculation by Mr. Zerchera and Mr. Guzman. There was evidence that he sold drugs at the BMT houses for about six months, is that right, before he was arrested? Yes, there was evidence that he was at the BMT houses and made sales there, out in front of them. But for around six months? For approximately six months. Okay, thank you. You've saved also a minute for rebuttal. Mr. Wu? Thank you, your honor. Good morning. I'm a police of the court, Jason Wu, on behalf of the United States. With me at council table is one of the trial attorneys, Ilham Hosseini. It's a bit of a truism that generals make a mistake when they keep fighting the last war. And that's what arguments which are attacking or questioning the credibility of key witnesses and suggesting there are different ways to reweigh the evidence. But of course, that's not the standard of review on appeal. And faithful adherence to the standard of review resolves many of their claims, particularly the sufficiency ones. So I'll turn straight to the first claim raised by Mr. Chacon today. He questions the sufficiency of counts eight and nine and tries to draw a link to count six and seven. However, those two are separate issues, and here's why. He was charged under Pinkerton theory, and thus the key question is whether it was foreseeable to him that the crimes in counts eight and nine would be committed by his co-conspirators. Counts eight and nine are just possession. Possession of drugs and then possession of a firearm at a BMT trap, one of their sale locations. And obviously, that's a very different question than whether it was foreseeable to him that certain members would go out and commit a separate robbery or aggravated assault that night. And the key testimony here, I think, which draws, which explains why it's foreseeable to him, is the testimony of Nadeem Guzman, who explains at page 113 of docket entry 827, he's asked, on November 20th, that day before the robbery, the building you were in, on that day was the building used for narcotics sales. Yes. Who sold narcotics on November 20th? Me, Maureen Chacon, Christopher Altamirano, James Dixon. So that goes to show, essentially, after a full day of selling to all members of the conspiracy, that there would be drugs and a gun protecting their stash house that night. The next claim Chacon raises is that there was evidence introduced of uncharged robberies and that this impermissible Rule 404 evidence. As we argue in the briefs, and I won't touch on it too much, but that was inextricably intertwined with the conspiracy because, as Judge Pryor alluded to in earlier questioning, that was part of their way of funding their drug purchases. They went out, they robbed people in the neighborhood, then they used that money to purchase drugs. That also comes from the testimony of Nadeem Guzman, docket entry 827, pages 15 to 16, 21 to 22. I'll turn next to the sufficiency challenge raised by Mr. Altamirano. He challenges the vicar counts, and in particular, today, he focused on the lack of identifications. But I think he mischaracterizes the record on that in a significant way. He claims that the civilian were not able to make IDs on the scene and that they again failed to make the IDs at trial. However, the civilian witnesses, two of them, testified that they did make IDs on the scene. They merely couldn't replicate them in the courtroom. And that's at docket entry 831, page 32. And then at page 53, there's the clearest evidence of this. Mr. Lorena, one of the victims, is asked, who did you identify? And his answer was, both individuals that robbed us. Now, the way that government... Didn't he later brag about it? Correct. Correct. In addition, there's evidence that Mr. Altamirano bragged about it on his jailhouse recordings. And of course, the police officer testified and confirmed the on-scene identifications made of Mr. Altamirano and Mr. Thompson. Moving on to Mr. Portella. This morning, he argued the suppression issue. Judge Pryor, you had it exactly correct. First of all, he doesn't have standing because he's a passenger, and we've submitted several supplemental authorities on that. And secondly, when he important fact, which is that the officer who came to the door and encountered Mr. Portella, smelled marijuana, giving him probable cause to search the vehicle without a warrant. For Mr. Portella, even though he didn't argue it, can you do a sufficiency for me? Absolutely. The sufficiency, if you don't mind, the sufficiency on which count? The main conspiracy? Count five. Count five, of course. So, it's important. There are two reasons why the evidence there is important to remember. He's actually not challenging the sufficiency of count four, which is the underlying drug trafficking conviction. In other words, count five is a companion to count four, which says he carried a gun in furtherance of count four. And he has not challenged count four. So, he's admitting that he was committing drug trafficking on that date, November 18th, 2013. And so, then the only question is, if you're carrying a gun to or from concededly an activity of drug trafficking, which is the possession of marijuana with intent to in our brief, make clear that there is. Separately, even if you consider it a challenge to count four, the evidence is very clear in Government's Exhibit 242. Mr. Portella receives a request from a fellow BMT member, Mr. Ramirez, that same day, asking him for some marijuana. And I'll just briefly pause to note, in his brief, Portella characterizes that as a generalized request to 12 or 13 people, but he's misinterpreting the exhibit. What the exhibit actually is, is a Facebook business record that compiles Mr. Ramirez's Facebook messages. So, it's essentially like looking at someone's email inbox. So, while there are multiple messages between Ramirez and other people, that particular message on November 18th is only between him and Mr. Portella. And you know, in part, because he addresses Portella by his nickname of Papa. Moving on from that, Mr. Portella argues that his sentence appeal waiver is invalid. In the first place, the colloquy is specific on that. The court asks him, you understand you will not appeal this sentence to a higher court. That's exactly what's required under Busher. There's no requirement that you ask three or four questions and one will suffice. Do you think that the recent decision of the Supreme Court about the, when it comes to the standing on the motion to suppress the case that involved the rental agreement in the rental car, basically validated what our circuit's position had been about establishing standing for someone like a passenger or a borrower? Absolutely. I think it's consistent and it does validate that. In particular, and I know earlier decisions of this court, including your own, have referenced this. One of the key parts of that inquiry is whether a passenger has the ability to exclude others, right? That sort of property right about the ability to exclude. And there's no evidence of that here. And it makes good sense, right? So the way I see the breakdown is, if you're the owner of a car, you always have the right to exclude people. Even if you don't own it, you're borrowing it, but you're the sole driver and you have sole and exclusive possession of it at that time, you can exclude people. When you're the passenger in a car driven by the owner, the owner obviously is the one who has the right to exclude or include people, not the passenger. And that's why there's no standing here. I'll turn to the final challenge. Mr. Dixon challenges the insufficiency of the conspiracy evidence. And he says essentially that he did not share profits, first of all, and that the only evidence against him is one sale. On the not sharing profits point, of course, that's not an element of conspiracy. We're all familiar with the elements, just an agreement for an unlawful purpose and the defendants willfully and knowingly joined that agreement. And here, the evidence of the conspiracy is the existence of a gang that sold drugs out of a defined territory in Little Havana for many years. And moreover, the evidence of the agreement lies in the benefits and the obligations that members undertook as part of that group, including referring customers to each other, backing each other up in fights, but also on the flip side, having obligations to each other, like having to provide money for imprisoned members or assisting as lookouts and such. As to Dixon specifically, there are four categories of evidence that I would direct the court to in terms of considering his sufficiency challenge. The first, Judge Pryor already alluded to, is co-conspirator testimony. So not only did Mr. Zerquera identify Dixon as a member of the group, but also Mr. Guzman, when asked the open-ended question, who were the members who sold during the day? He identified, among others, Dixon. That's at docket entry 827, page 13. The second category, which corroborates that, is that there was a neighborhood witness, so not someone who was a member of the group and not testifying under a cooperation agreement, who said he saw Dixon selling with the group frequently. And in fact, he said he was one of the most stubborn and persistent sellers of the group. Third category, social media evidence. So Dixon, in his brief, suggests that he himself did not have a Facebook or Instagram or these social media platforms. However, other members did. And the other members posted images that showed Dixon, among other things, making the BMT hand sign, which declares his allegiance or affiliation with the group, and brandishing firearms. Those are at Government's Exhibit 240, 299, 308, and 332. So four images with Dixon. And the final category I'll mention is that those jailhouse calls intercepted between Dixon, Altamirano, and Portella show him discussing the group's drug operations and also the assistance that he would provide those members in jail. So at Government's Exhibit 79A, for instance, there's an extended discussion about the selling of crack cocaine, which the group refers to as slabs. And then also Altamirano inquires whether Dixon has a steady supply for marijuana. And Dixon confirms that someone's supplying him with marijuana. That's at Government's Exhibit 79A, pages 15 to 19. And he's on numerous other calls, Government's Exhibit 60, 66, 67, 68, 73, and 75 as well. So unless this court has further questions, the government urges- I just wanted you to tell me on Portella that message between him and the fellow who wanted to purchase the marijuana. Where do I find that in the record? That's at Government's Exhibit 242. We did not include that in our supplemental appendix, but the court subsequently requested all the exhibits, so we filed a CD with the clerk that contains all of those exhibits. 242. That's all of the messages, or does that break out, that one you're talking about now? That's all of the messages, correct. But that's on the first page. It's something to the effect of- I'm paraphrasing, but it's something like, Papa, do you know anyone around my area who can bring some green right now? I'm on house arrest. Thank you. Thank you. Mr. Booth, thank you very much, particularly for your command of the record this morning. Thank you. Mr. Gonzalez. No, you didn't- you used your time, that's right. Thank you. Mr. Horwitz. Your Honor, we focused on the Vicar count for Mr. Altamirano, specifically the fourth of the five prongs, which is whether Mr. Altamirano committed the crime charged. Even if this court finds that Mr. Altamirano committed the crime charged, we still have that fifth prong that the government must satisfy, which they have not done in this case, and they did not address, that the general purpose in doing so was to maintain or increase his position in the group. The government will have you believe that the robberies were committed to fund the purchase of drugs. Your Honor, it's the drug sales that fund the purchase of drugs. Selling drugs is a for-profit business. If it's not a for-profit business, they're not going to be in the business, so that argument makes no sense. Well, if you don't have any drugs or money and you need to keep the business going, a robbery might allow you to do that. But if you're selling the drugs for a profit, the profits will- What if you use up the profits? Obviously, what if you don't? But in this case, the key is here, whether the robbery or the assault with a deadly weapon was committed to maintain or increase his position, and that element was not satisfied in the case in chief by the government. Thank you, Your Honor. Thank you, Mr. Hortz. Mr. Sams. In regards to the sufficiency of Count 4 and 5, there was ample lack of evidence. There was lack of evidence in regards to whether or not Portela sold crack cocaine, and specifically whether or not they could ever establish that he sold 280 grams of crack cocaine. There were two cooperating witnesses that the government used to try to show that Mr. Portela sold these drugs. Repeatedly during their testimony, when they were asked to identify which of the members of BMT did those things, they would always leave out Mr. Portela. And it happened on numerous occasions to the point where the arguments that I made in the brief were that, and I outlined each time that this was brought up, they didn't, the government never produced enough evidence or any evidence to show that he sold a particular quantity of cocaine which is required as part of proving the crime. As the Court well knows, you cannot . . . You don't have him on the conspiracy count? He wasn't convicted of the conspiracy count? He was. Okay. Thank you. He was convicted. Thank you, Your Honor. Mr. Donne. Thank you. As to the four pieces of evidence the government alluded to, I'd like to start with Mr. Mendoza first, who's the neighbor who lived across from one of these locales. Mr. Mendoza did say Mr. Dixon was there all the time and selling, and Mr. Dixon at no time has not said that he sold crack cocaine. He has done that, but he hasn't been part of this conspiracy. Mr. Mendoza's testimony is particularly important when we look at the fact that Mr. Mendoza said no. He saw other people commit robberies, but Mr. Dixon didn't do that. He saw other people acting as lookouts, but no, there was no testimony of Mr. Dixon as a lookout. As to images on social media, the government points to two photographs. One is Mr. Dixon making the okay sign with three fingers up, which the government said that was the BMT gang sign, and the other is him holding a firearm. Neither of these photographs were posted by Mr. Dixon. There are photographs that were taken, other members have posted them, but in those photographs, there's nothing that makes him a part of this group. Holding a firearm doesn't make you a part of any particular organization. And then as to referring the cases to each other, they didn't refer customers to each other. They didn't back each other. Mr. Dixon didn't refer customers. Mr. Dixon didn't back anybody up. He wasn't involved in any of the violence or fighting. Mr. Dixon just sold for himself by himself. Thank you. Okay, Mr. Donnay. We'll take a close look at the record. I want to note that Mr. Gonzalez, Mr. Horwitz, Mr. Sams, Mr. Donnay, all of you were court appointed. We very much appreciate you accepting the appointment of the court and discharging your responsibilities very well this morning. Thank you.